

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-1997

# United States v. Haut

Precedential or Non-Precedential:

Docket 95-3673,95-3674

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Haut" (1997). *1997 Decisions.* Paper 48.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/48

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Nos. 95-3673/3674[1]

UNITED STATES OF AMERICA

Appellant

v.

AGATHA R. HAUT; HENRY D. HENSON
PAUL D. HAUT, JR. STEPHEN HAUT

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Nos. 94-cr-00027-3 and 94-cr-00027-4)

Argued October 29, 1996

BEFORE:  SLOVITER, Chief Judge, COWEN and ROTH
Circuit Judges

(Filed   February 26, 1997  )

Bonnie R. Schlueter, Esq.
Shaun E. Sweeney, Esq. (Argued)
Office of United States Attorney
633 United States Post Office
 and Courthouse
Pittsburgh, PA  15219

        Counsel for United States of America

Richard F. Pohl, Esq.
140 South Main Street
Greensburg, PA  15601

        Counsel for Paul H. Haut, Jr.

---

[1]These appeals are related to and were consolidated with the appeals in Nos. 95-3593/3629/3630 and 96-3378.  These four appeals have on this day, contemporaneously with the filing of this opinion, been disposed of by judgment orders.

Carl M. Janavitz, Esq. (Argued)
710 Fifth Avenue
Suite 2000
Pittsburgh, PA  15219

        Counsel for Stephen B. Haut

_____

OPINION

_____

COWEN, Circuit Judge.

        This is an appeal by the government from two judgments
of sentence imposed by the United States District Court for the
Western District of Pennsylvania.  Defendant-appellees are Paul
Haut (P. Haut) and Stephen Haut (S. Haut).  Both were convicted
of conspiracy to commit malicious destruction of property by
means of fire (18 U.S.C. § 371).  S. Haut was also convicted of
mail fraud (18 U.S.C. § 1341).  The district court decreased the
offense levels of both defendants by 4 points, based on a finding
of minimal participation.  U.S.S.G., Guidelines Manual, § 3B1.2
(1995).  The district court further reduced their offense levels
an additional 6 points by way of a downward departure, based on a
finding that the government's witnesses were not credible.
U.S.S.G. § 5K2.0.[2]

        We will affirm the district court insofar as it
decreased the offense levels of both P. Haut and S. Haut pursuant

_____

[2]At oral argument the government withdrew a third basis for
appeal that it had earlier asserted in its brief.  That third
basis was a contention that S. Haut's sentence should have been
enhanced two points pursuant to U.S.S.G. § 3C1.1.

2

to section 3B1.2 (minimal participation). However, finding no legal justification in the Sentencing Guidelines for the downward departure given to P. Haut and S. Haut pursuant to section 5K2.0 et seq. (other grounds for departure), we will reverse.


I.

A.  Factual Background

This appeal challenges the sentences received by P. Haut and S. Haut for crimes arising out of the illegal burning of a bar, the Inner Harbor Lounge. The arson was accompanied by mail fraud (the U.S. Mail was used to process fraudulent fire insurance claims related to the arson) and culminated in the conviction of four defendants, Henry Henson (Henson), Agatha R. Haut (A. Haut), P. Haut, and S. Haut. The activities of Henson and A. Haut, whose sentences were not appealed by the Government, are described below to provide background and to place the actions of P. Haut and S. Haut in proper perspective.

Henson, the Vice President of the Inner Harbor, Inc. (owner and operator of the bar), was convicted of malicious destruction of property by fire (18 U.S.C. § 844(i)), conspiracy to commit malicious destruction of property by means of fire (18 U.S.C. § 371), and mail fraud (18 U.S.C. § 1341). Henson was the foremost offender in the group and his activities in the illegal enterprise were extensive. He personally set the fire and solicited a bar patron to assist him in doing so. He pondered aloud whether to "mak[e] it look like wiring." Gov't. App. at 16. He offered to burn a friend's financially troubled bookstore

3

if the friend would help him burn the Lounge.  Henson took "sick leave" from work on the three days surrounding the evening of the fire.  He attempted to explain at trial that the reason for his absence from work was not his health, but unelaborated "business to take care of."  III App. at 944.  Several witnesses testified that of the four defendants, Henson most often brought up the subject of destroying the Inner Harbor Lounge.  Finally, Henson confided to a friend that he had burned the bar and used an accelerant in the process.

A. Haut, the President of the Inner Harbor, Inc., was convicted of conspiracy to commit malicious destruction of property by means of fire (18 U.S.C. § 371) and mail fraud (18 U.S.C. § 1341).  She is the mother of the three other defendants, and fully participated in discussions at the Inner Harbor Lounge in which she voiced her desire to burn down the bar.  She specifically asked that various items stored in the attic of the Lounge be removed before the planned fire, and later placed those items in storage at her home.

After entering into a one-year agreement listing the Lounge for sale with a real estate agent, A. Haut abruptly contacted the real estate agent approximately six weeks before the fire.  For no apparent reason, she directed the agent to cancel the contract and discontinue attempting to sell the Lounge.  A. Haut purchased the fire insurance policy covering the Inner Harbor less than a month before the fire.  This policy was obtained after a period of more than four years in which there was no coverage.  She declined the offer of the insurance company

4

to mail her the insurance policy covering the bar, preferring instead that it be obtained in person on the very day of the fire. On the basis of the fraudulent scheme of A. Haut, the insurance company issued a check in the amount of $100,000.

P. Haut and S. Haut are the only defendants with whom we are directly concerned in this appeal. P. Haut was convicted of conspiracy to commit malicious destruction of property by means of fire (18 U.S.C. § 371) and mail fraud (18 U.S.C. § 1341). At the direction of A. Haut, he removed some items from the Lounge prior to the fire and participated in family gatherings at which the arson was discussed. S. Haut was convicted of conspiracy to commit malicious destruction of property by means of fire (18 U.S.C. § 371). He also was present at the Lounge when the arson was discussed. The jury found that neither brother took an active role in the actual burning or benefited financially from its occurrence.

B. Proceedings in the District Court

The district court determined that the appropriate base offense level pursuant to the Sentencing Guidelines for both P. Haut and S. Haut was 20. U.S.S.G. § 2K1.4(a)(2)(B).[3] Both fell

_____

[3]P. Haut was convicted of mail fraud and conspiracy to commit malicious destruction of property by means of fire, whereas S. Haut was convicted only of the latter. For offense level computation purposes, P. Haut's counts were grouped together because they involved substantially the same harm. Section 3D1.3(a) provides that when counts are grouped, the offense level applicable to the group as a whole is that of the count carrying the highest offense level. For this reason, S. Haut and P. Haut both had a base offense level of 20, the level indicated for conspiracy to commit arson, which is higher than that specified for mail fraud. U.S.S.G. §§ 2F1.1 and 2K1.4.

under Criminal History Category I, yielding a sentencing range of 33 to 41 months for each. The district court, however, granted both P. Haut and S. Haut a reduction of 4 points for minimal participation, pursuant to Guidelines section 3B1.2. In addition, the district court granted each a further 6-point downward departure by reason of the poor credibility of the government's witnesses, citing as authority Guidelines section 5K2.0. The court stated that in granting the latter reduction, it acted on its prerogative to adjudge the credibility of witnesses "for sentencing purposes." P. Haut's App. at 69.

The district court found that four of the witnesses for the prosecution were "poor . . . in terms of appearance, demeanor, recollection, candor, and lucidity," and described them as reminiscent of "the cast from the movie, Deliverance" [Deliverance depicts a coarse, brutal, and degraded group of people]. P. Haut's App. at 68. The court justified its 6-point departures based on its findings that "the clear weight of the credible evidence supports the findings and conclusions of the Court in this rather unique and bizarre prosecution." Id. at 69. In fact, the district judge related that had this matter been a bench trial, he would have found the government's witnesses to have been so lacking in credibility that he would have acquitted the defendants. The 4-point reductions for minimal participation were based on the court's determination that the involvement of both S. Haut and P. Haut was quite limited relative to Henson's and A. Haut's substantial and pervasive role in the crimes.

6

After the court reduced the base offense level of both S. Haut and P. Haut by 10 points, their final offense level was 10.  This resulted in an applicable guideline range of 6 to 12 months.  The district court imposed a sentence of 6 months home detention and 5 years' probation on each defendant.

## II.

The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231 and 18 U.S.C. §§ 371, 844(i), and 1341.  We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  When reviewing the sentencing decisions of the district courts, we apply an "abuse of discretion" standard for departures and other questions involving "the traditional exercise of discretion by a sentencing court."  United States v. Koon, -- U.S. --, 116 S.Ct. 2035, 2046-47 (1996).

> [W]hether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point.  [A]n abuse of discretion standard does not mean a mistake of law is beyond appellate correction.  A district court by definition abuses its discretion when it makes an error of law.

Id. at 2047 (citations omitted).  See also United States v. Romualdi, 101 F.3d 971, 973 (3d Cir. 1996).  In contrast, "[w]e review under a clearly erroneous standard the district court's factual determinations, such as whether a defendant receives a reduced or increased offense level based on his role in the offense . . . ."  United States v. Salmon, 944 F.2d 1106, 1126 (3d Cir. 1991).

## III.

7

We first turn to the government's challenge to the finding of the district court that S. Haut and P. Haut were "minimal participants" warranting 4-point reductions in their base offense levels. U.S.S.G. § 3B1.2. The Guidelines offer limited insight into the precise meaning of "minimal participant." Specifically, the Guidelines provide:

§ 3B1.2  Mitigating Role

Based on the defendant's role in the offense, decrease the offense level as follows:

(a)  If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b)  If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2.[4]  Pursuant to section 3B1.2, the district court decreased S. Haut's and P. Haut's offense levels by 4 points each. We find that the district court did not misconstrue the

_____

[4]The official commentary to section 3B1.2 of the Guidelines explains that:

1.  Subsection (a) applies to a defendant who plays a minimal role in a concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of activities of others is indicative of a role as minimal participant.

2.  It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

legal meaning of "minimal participant" under subsection (a). We therefore must sustain the district court's factual finding that S. Haut and P. Haut each merit classification as minimal participants unless we determine that the district court was clearly erroneous in its fact-finding. See, e.g., 18 U.S.C. §§ 3557, 3742(d); United States v. Badaracco, 954 F.2d 928, 933 (3d Cir. 1992)(quoting Inigo, 925 F.2d at 658); United States v. Gonzales, 927 F.2d 139, 145 (3d Cir. 1991).

The commentary to section 3B1.2 states that a minimal participant is, inter alia, "among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 (official commentary). The district court made a factual finding that "[d]efendants had no [financial] interest in the Inner Harbor [Lounge] and did not benefit in any manner from the fire at the inn." P. Haut's App. at 66. Of the four defendants, S. Haut was the only one to be convicted of only one crime, not two or three. With relation to the crime for which he was convicted, conspiracy to commit malicious destruction of property by means of fire, he was among the least involved members of the conspiracy. There is no indication that S. Haut directly assisted in the burning of the Lounge or the removal of property prior to the fire. He apparently had no ownership interest in the property or business of the Inner Harbor Lounge, and received no monetary benefit from the fire.

P. Haut's classification as a minimal participant also withstands scrutiny. As with S. Haut, the district court made a factual finding at sentencing that P. Haut had no real economic

9

interest in the Inner Harbor Lounge or its furnishings, and that he did not benefit financially from the fire.

The district court concluded that, in comparison with A. Haut and Henson, P. Haut and S. Haut were "among the least culpable" of the conspirators. See P. Haut's App. at 65-66; U.S.S.G. § 3B1.2. In reaching its conclusion, the district court correctly "assess[ed] the demeanor of the defendants and all the relevant information to ascertain [their] culpability in the crime." United States v. Hewin, 877 F.2d 3, 5 (5th Cir. 1989). The district court did not act improperly in considering economic gain and the extent of physical participation as indicia of the level of culpability. See United States v. Peters, 962 F.2d 1410, 1415 (9th Cir. 1992); United States v. Ocampo, 937 F.2d 485, 491 (9th Cir. 1991).

Admittedly, P. Haut's involvement in the events surrounding the burning of the Lounge seems to have been more substantial than that of S. Haut. Nonetheless, the question before us is not whether we would have characterized S. Haut and P. Haut in precisely the same manner as the district court did. Our concern is whether, given the factual findings made at trial, the "minimal participant" designation is clearly erroneous. We are mindful that "[a] simple statement by the district court" together with some supporting facts of record concerning a defendant's status as a minimal participant is "typically sufficient to settle the question." Ocampo, 937 F.2d at 491.

As we have noted in earlier cases, "[u]nder the clearly erroneous standard, a finding of fact may be reversed on appeal

only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." American Home Prod. Corp. v. Barr Lab., Inc., 834 F.2d 368, 370–71 (3d Cir. 1987); see also Haines v. Liggett Group Inc., 975 F.2d 81, 92 (3d Cir. 1992). In Gonzales, we stated that the district court's "characterization [of the defendant] as a minor participant may have been generous," but we appropriately affirmed. Gonzales, 927 F.2d at 145. Here, too, we suggest that the district court may have been "generous," but find that it was generous in a manner consistent with the Guidelines. Our review of the record has presented no reason to reverse the district court's determination that the "minimal participant" classification accurately describes S. Haut and P. Haut.

IV.

A.

While the district court's factual findings that S. Haut and P. Haut were minimal participants survives our scrutiny, we find that the 6–point downward departures granted by the district court are unsupportable and without precedent. The district court stated at sentencing that it disagreed with the finding of the jury and was granting capacious departures to mitigate the impact of the jury verdict. See P. Haut's App. at 68–69. This is at odds with both the intent of the Guidelines and the division of responsibilities that underpins our jury system.

In passing the Sentencing Reform Act of 1984, Congress

11

"sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G., Ch. 1 Pt. A(3) at 2 (1995). The Guidelines were created in part to protect a basic precept of the rule of law, that like cases are treated alike. At the same time, the approach taken by the Guidelines is not simply a mechanistic application of tables to yield prescribed sentences for crimes. The Guidelines allow for numerous adjustments to be made to better customize a sentence to the individual situation of a defendant. See U.S.S.G. Chs. 3, 4. In addition, departures from the Guidelines are warranted in some circumstances after certain procedures are followed. See U.S.S.G. Ch. 5 Pt. K. The well-established law instructs us that a court may not depart unless it

> finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b) (1988); see also United States v. Johnson, 931 F.2d 238, 241 (3d Cir.), 1991.

Koon has recently shed new light on the proper evaluation of departure factors, and we quote it at length here:

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering "the structure and

> theory of both relevant individual guidelines and the Guidelines taken as a whole," decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be "highly infrequent."

Koon, 115 S.Ct. at 2045 (emphasis added)(citations omitted).

"Encouraged factors" offer sentencing courts assistance by setting out a host of considerations that may take a particular case outside the "heartland" of any individual guideline, thereby warranting a departure. See U.S.S.G. § 5K2.0 et seq.; U.S. v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993). "Discouraged factors" are those circumstances enumerated to be "not ordinarily relevant" in determining departures. See U.S.S.G. § 5H1.1 et seq.; Rivera, 994 F.2d at 948. A factor is discouraged when, despite the Guidelines' failure to provide for sentencing adjustments based on it, its presence or absence is insufficient "to transform a 'heartland' case into an unusual case outside the heartland." Rivera, 994 F.2d at 948. Such factors include, inter alia, age, socio-economic status, and community ties. U.S.S.G. §§ 5H1.1, 5H1.6, 5H1.8.

In the instant case, the district court made a departure on the grounds that the witnesses for the prosecution lacked credibility. We have found no indication that the Sentencing Commission specifically considered making upward or downward adjustments when witness testimony supporting criminal convictions is of dubious credibility. No explicit statement of the Commission makes this factor either encouraged, discouraged, or forbidden. Of the wide variety of other factors we know to

13

have been considered in formulating the Guidelines[5]——including the defendant's level of participation in a crime (hence the "minimal participant" reduction)——none resembles that invoked by the district court in the instant case.

The introduction to the Guidelines manual makes clear that:

> The Commission intends the sentencing courts to treat each guideline as <u>carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes</u>. When a court finds an atypical case, one to which a particular guideline linguistically applies but where <u>conduct significantly differs from the norm</u>, the court may consider whether a departure is warranted.

U.S.S.G., Ch. 1 Pt. A(4)(b) at 5-6 (emphasis added). In assessing "whether a departure is warranted," we have been instructed by the Supreme Court to evaluate whether the proposed ground for a departure is supported by "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole." <u>Koon</u>, 115 S.Ct. at 2045. We find that necessarily embedded in the heartland of every guideline is the assumption that individuals sentenced under it have been found guilty beyond

___

[5]<u>See generally</u> Kirk D. Houser, <u>Downward Departures: The Lower Envelope of the Federal Sentencing Guidelines</u>, 31 DUQ. L. REV. 361, 364 (1993)(explaining that Congress and the Sentencing Commission considered the following factors in formulating the Guidelines: grade of the offense; aggravating or mitigating circumstances of the crime; the nature and degree of the harm caused by the offense; the community view of the gravity of the crime; the public concern generated by the offense; the deterrent effect that a particular sentence may have on others; the current incidence of the offense; defendant's age, education, vocational skills, mitigating or plainly relevant mental and emotional conditions, physical condition (including drug abuse), previous employment record, family ties and responsibilities, community ties; role in the offense, criminal history, and degree of dependence upon criminal activity for a livelihood.) <u>See also</u> U.S.S.G. §§ 5H1.1 <u>et seq.</u>, 5K2.0 <u>et seq.</u>

a reasonable doubt. Here, the district court in effect claims that "circumstance[s] of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" places the defendants outside the heartland of the guidelines under which they were sentenced. U.S.S.G. § 5K2.0 Policy Statement. The alleged "special circumstances" are simply that the defendants did not in fact commit the crimes and should not have been found guilty.

However incredible the district court found the witnesses, the jury determined the defendants to be guilty beyond a reasonable doubt. We find the district court's view, that a downward departure is justified when the district court doubts the veracity of government witnesses and the guilty verdict they support, to be categorically inappropriate. We are mindful that Koon explains that "with few exceptions, departure factors should not be ruled out on a categorical basis." 116 S.Ct. at 2051. Nonetheless, the instant case involves one of those few exceptions. The district court's decision to depart was not based upon a sound exercise of discretion, as we explain below.

When civil cases are decided by bench trial rather than by jury, we are careful to give "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses." FED. R. CIV. P. 52(a). By contrast, the federal rules of civil and criminal procedure do not contain a corresponding rule for cases tried by a jury. In such cases, it is firmly established that it is "the jury's prerogative to decide all questions of credibility." United States v. Gambino,

926 F.2d 1355, 1367 (3d Cir.), 1991. See also United States v. Rockwell, 781 F.2d 985, 990 (3d Cir. 1986)("the jury, not the court, . . . judges the credibility of witnesses")(quoting Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412; United States v. Giampa, 758 F.2d 928, 935 (3d Cir. 1985)("One of the oldest . . . rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses.")(quoting United States v. Cravero, 530 F.2d 666, 670 (5th Cir. 1976)); Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061 (3d Cir. 1996)("Evaluation of witness credibility is the exclusive function of the jury . . . .")(quoting Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 262 (3d Cir. 1987).

It is a basic tenet of the jury system that it is improper for a district court to "substitute[] [its] judgment of the facts and the credibility of the witnesses for that of the jury.  Such an action effects a denigration of the jury system . . . ."  Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir.),

Finally, as we stated in Giampa:

> The trial judge cannot arrogate to himself this power of the jury simply because he finds a witness unbelievable.  See United States v. Weinstein, [452 F.2d 704,] 713 [(2d Cir. 1971)].  Under our system of jurisprudence a properly instructed jury of citizens decides whether witnesses are credible.  The trial judge is deemed to have no special expertise in determining who speaks the truth.

758 F.2d at 935 (3d Cir. 1985)(quoting United States v. Cravero, 530 F.2d 666, 670 (5th Cir. 1976)(footnotes and citations omitted)).

The attorney for S. Haut conceded at trial:

16

> I realize [my argument that a downward departure is warranted is] a stretch. I don't know what else I can present to this Court that would induce it to downwardly depart. I think it's absolutely ridiculous that [because of the Guidelines] I'm placed in the position of having to try and construct these somewhat tenuous arguments, but I don't know any way to do it other than that. I know the result that should be achieved, and I'm trying to give the Court something to hang its hat on.

P. Haut's App. at 62 (emphasis added). As the attorney for the Government aptly observed in response to this statement, "[Defense counsel's] proposed arrangement of the Guidelines . . . is really an unsupported circumvention of the Guidelines, and it's not supported by the facts or the law or, most importantly, justice in this case." P. Haut's App. at 64-65 (emphasis added).

The district court acknowledged its obligations in this matter: "The jury believed the testimony of the prosecution; and, therefore, we find that there is sufficient evidence which, if believed, supports the [base offense level of 20 calculated by] the probation officer." P. Haut's App. at 65-66. Nonetheless, after conceding its responsibility to honor the jury verdict, the district court backed away from doing so. Cf. Rockwell, 781 F.2d at 988 ("Yet in the very next sentence the district court, in effect, abrogated its prior directive which had devolved to the jury the task of determining all issues of credibility. . . ."). The district court disagreed with the judgment of the jury, as reflected in this statement at sentencing:

> We find that the evidence presented by these two witnesses far outweighs the evidence for the prosecution; and if the case against these Defendants was tried before this member of the Court in a bench trial, we would have found both Defendants not guilty.

P. Haut's App. at 68. After concluding that there was sufficient

17

evidence which, if believed, supported the sentence corresponding to offense level 20, the district court sought to substitute its own judgment for that of the jury:

> We find that the[] testimony [of two witnesses] was corrupt and polluted and must be received with great care and caution for sentencing purposes. We cannot sentence a citizen to prison on evidence based on the testimony of these two women. Their bias and interest in the outcome of this case is simply too apparent to be countenanced, <u>at least for sentencing purposes</u>.

<u>Id</u>. at 69 (emphasis added). In concluding that the witnesses were too "bias[ed] . . . to be countenanced, <u>at least for sentencing purposes</u>," the district court sought to short-circuit the jury system and reduce the severity of the jury verdict. <u>Id</u>. (emphasis added).

B.

The district court set forth a theory under which, "for sentencing purposes," it was "empowered to make credibility determinations." <u>Id.</u> In an effort to reserve for itself a right to assess credibility "in sentencing" when it is dissatisfied with the jury verdict, the district court proposed the existence of a relevant distinction between credibility assessment at trial and at sentencing.

To buttress its theory that a trial court is empowered to make credibility determinations "for sentencing purposes," the district court cited three opinions of this court, <u>United States v. Miele</u>, 989 F.2d 659 (3d Cir. 1993), <u>United States v. Gaskill</u>, 991 F.2d 82, 82-86 (3d Cir. 1993), and <u>United States v. Lieberman</u>, 971 F.2d 989 (3d Cir. 1992). These cases are inapposite to the instant case. Of these cases, only <u>Miele</u>

18

directly addresses the question of credibility assesssment. It holds that although there are some circumstances in which it is appropriate for a court to consider credibility at sentencing, those instances have to do not with the question of guilt, but with specific matters of degree concerning underlying issues.

In Miele, we held that a district court should "receive with caution and scrutinize with care drug quantity or other precise information provided by [an addict-informant] witness before basing a sentencing determination on that information." 989 F.2d at 667 (emphasis added). Miele is distinguishable from the present case because it nowhere invites district courts to use the questionable reliability of a witness as a basis for mitigating the effect of a jury verdict. Instead, Miele informs trial courts that when the severity of the sentence is calibrated to a fact that was related to the court by an inherently suspect witness, the court can take the credibility of the witness into account at sentencing. For instance, the district court can determine that the defendant in fact produced an amount of drugs different from that attested to by the witness. But the district court cannot determine, contrary to the finding of the jury, that the defendant is not guilty of the crime for which he was convicted, or that doubts as to the jury verdict in the judge's mind are sufficient to warrant a diminishment of the sentence. Where a jury finds a defendant guilty of a crime beyond a reasonable doubt, it is not the province of the district court to interpose its own doubts and thereby distort the effect of a guilty verdict.

19

*Miele* noted that a section of the Guidelines entitled "Resolution of Disputed Factors" explains that "the district court may not rest its decision upon facts until it determines that the fact or facts have sufficient indicia of reliability to support a conclusion that they are probably accurate." Id. at 668 (citing U.S.S.G. § 6A1.3). This section, however, explicitly applies to "factor[s] important to the sentencing determination . . . reasonably in dispute." U.S.S.G. § 6A1.3. In the present case, the only "disputed" matter germane to the departure was whether the defendants actually committed the crimes for which they were convicted. That question, having been resolved beyond a reasonable doubt by the jury at trial, was no longer "reasonably in dispute" when sentencing occurred. Id.

In *Gaskill*, the trial court denied a departure to a defendant solely responsible for the care of his mentally ill wife, finding that it "had no choice" and was not free to grant a departure. 991 F.2d at 83-84. On remand, we informed the district court that it "need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring a fair and reasonable sentence." Id. at 86. In that case, the conduct at issue was that of the defendant, who possessed extraordinary family circumstances and had been extremely attentive to the round-the-clock medical needs of his wife. Such extraordinary circumstances have been recognized as legitimate bases for departure. See, e.g., United States v. Higgins, 967 F.2d 841, 845 (3d Cir. 1992); United States v. Johnson, 964 F.2d 124, 128-29 (2d Cir. 1992); United

20

States v. Big Crow, 898 F.2d 1326, 1331 (8th Cir. 1990). But see United States v. Thomas, 930 F.2d 526, 529-30 (7th Cir.), 1991 While Gaskill, 991 F.2d at 86, rightly emphasizes that departures, used appropriately, ameliorate the rigidity of the Guidelines in important ways, it gives no indication that departures are appropriate solely because government witnesses impress the district court as incredible.

Lieberman held that a "sentencing court may depart downward when the circumstances of a case demonstrate a degree of acceptance of responsibility that is substantially in excess of that ordinarily present." 971 F.2d at 996. As with Gaskill, Lieberman does not support the district court's departure because it addresses the conduct of the defendant (his post-arrest contrition and ameliorative behavior), not the credibility of the witnesses. Lieberman also upheld a second departure granted by the district court based on the fact that the Government "manipulated his indictment" and failed to group together two substantially similar crimes, thereby raising his base offense level improperly. See id. at 998. While that second departure could be described as concerning the conduct of the prosecutor as well as the defendant, the ultimate question was the true behavior of the defendant: what was the appropriate way to characterize the crimes for which the jury found the defendant guilty?

By contrast, in the instant case the district court sought not to effectuate the findings of the jury in the manner it believed to be required by law, but to limit the effect of

21

those findings because it disagreed with the jury's finding of guilt. The effect of the district court's decision to depart based on credibility was to drain the verdict of its proper force. The district court was obligated to sentence the defendants within the range established by the Guidelines.

Of course, a district court is permitted in appropriate cases to enter judgment of acquittal when it finds that the circumstances of the case make the jury's verdict unsupportable. FED. R. CRIM. P. 29; see United States v. Villard, 885 F.2d 117, 120 (3d Cir. 1989); United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987), Cf. EEOC v. Delaware Dept. of Health and Social Services, 865 F.2d 1408, 1413 (3d Cir. 1989)(similar standard in civil context). But here, the district court concluded that judgment as a matter of law would be inappropriate: "We close by noting that there is sufficient evidence which, if believed, supports the verdict of the jury; and, therefore, we are not privileged to grant a new trial or enter judgment [of acquittal]." P. Haut's App. at 69. The district court nonetheless asserted the right to make the type of credibility judgments we have shown to be inappropriate: "However, for sentencing purposes, we are empowered to make credibility determinations, and in this case the clear weight of the credible evidence supports the findings and conclusions of the Court in this rather unique and bizarre prosecution." Id.

At oral argument counsel for S. Haut sought to defend this theory that the district court is free to assess the credibility of witnesses and to give effect to those assessments

22

through the severity of the sentences imposed. Counsel hypothesized the existence of "a small space" in which a judgment as a matter of law is not justified but neither is the sentence corresponding to the jury's verdict, because the poor quality of the evidence against the defendant(s) "shock[s the] conscience." Tape of Oral Argument, October 29, 1996 (on file with the Clerk, U.S. Court of Appeals for the Third Circuit). In that situation, counsel suggested, a court is justified in departing downward. While this argument is creative, we know of no case in which a district court has been allowed to "split the difference" between the "not guilty" verdict a bench trial would have yielded and the conviction actually handed down by the jury. To countenance such a broad scope of judicial discretion would be to sap the integrity of both the Guidelines and the jury system.

V.

For the reasons stated, we will affirm the October 20, 1995, judgment of sentence insofar as it granted both defendants a 4-point reduction for minimal participation. We will reverse the judgment insofar as it granted 6-point downward departures to both defendants, and remand the case to the district court for resentencing consistent with this opinion.

23